## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAY H. SMITH, II**<br>18 Long Lane Road<br>Boyertown, PA 19512<br><br>Plaintiff<br><br>vs.<br><br>**NORFOLK SOUTHERN<br>CORPORATION d/b/a NORFOLK<br>SOUTHERN RAILWAY COMPANY**<br>1200 Peachtree Street NE<br>Atlanta, GA 30309<br><br>Defendant | **CIVIL ACTION**<br><br>**NO.:**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

### JURISDICTION

1. The Plaintiff, Jay H. Smith, II, brings this action against the Defendant, Norfolk Southern Corporation, for violations of the Federal Rail Safety Act, 49 U.S.C. §20109.

2. This court has subject matter jurisdiction in this case pursuant to the Federal Rail Safety Act, 49 U.S.C. §20109(d)(3) (the "FRSA").

### THE PARTIES

3. The Plaintiff, Jay H. Smith, II ("plaintiff" or "Smith") is a citizen and resident of the Commonwealth of Pennsylvania, residing therein at 18 Long Lane Road, Boyertown, PA 19512.

4. The defendant, Norfolk Southern Corporation d/b/a Norfolk Southern Railway Company ("Norfolk" or "defendant") is a corporation duly organized and existing under and by virtue of the laws of the State of Virginia, does business in the Eastern District of Pennsylvania, and has a place of business located at 1200 Peachtree Street NE, Atlanta, GA 30309.

1

5.     At all times material hereto, Norfolk Southern operated 2,419 miles of track in Pennsylvania; had 1,589 bridges in Pennsylvania; and had 1,838 grade crossings in Pennsylvania. Furthermore, the defendant operates inbound and outbound trains throughout Pennsylvania carrying numerous types of freight.  In addition, the defendant serves the ports of Philadelphia and has facilities in King of Prussia, Pennsylvania and Pottstown, Pennsylvania.  As such, the defendant regularly engages in interstate commerce and conducts business within the Commonwealth of Pennsylvania in the Eastern District of Pennsylvania.

6.     During all times mentioned herein, the railroad defendant engaged in interstate commerce by providing railroad transportation between several of the states of the United States.

7.     At the time of the defendant's FRSA violations, the plaintiff was employed by the defendant railroad.

8.     The plaintiff is a qualified employee within the meaning of 49 U.S.C. §20109.

### FACTS – SMITH'S PROTECTED ACTIVIES

9.     Mr. Smith has been employed by the defendant since 2005 and has worked as an engineer since 2012.  Mr. Smith was also a member of the defendant's safety committee for two years.

10.     Mr. Smith is a member of the SMART union, local 386 and served as the local chairman from 2010-2016.

11.     Since 2005, Mr. Smith has worked hard to develop a reputation for competence and safety, and aggressively sought to make defendant's workplace safer.

12.     On or about April 2, 2022, plaintiff was employed by the defendant and was working at defendant's Abrams Yard, King of Prussia, Pennsylvania yard in the capacity of an engineer, on job assignment K40.

13. On April 1, 2022, plaintiff was working with a conductor Daniel Bogan ("Bogan"). The two had worked together on that job assignment for close to a year.

14. On April 2, 2022, Bogan started to slack off and was no longer acting with his usual due diligence and care by performing his work in a competent and safe manner.

15. Mr. Smith spoke to Bogan about this sudden change in his work performance and asked him to improve his effort. Bogan shared with Smith that he was unhappy with his position, and was interviewing for other jobs. Bogan stated he was no longer interested in performing his job at the same level of effort that he had previously.

16. Bogan made known to Smith that he was actively seeking a new job outside of the railroad and was tired of the requirements of his job as a conductor. Bogan stated he would no longer follow what Bogan considered to be unnecessary safety rules of the railroad that made the job more time consuming and difficult.

17. Smith continued to work with Bogan and tried to improve Bogan's job performance.

18. Unfortunately, Bogan's work effort did not improve, and instead declined significantly, Mr. Smith was forced to report Bogan's unsafe work practices and safety violations to the defendant's yardmaster who was his supervisor.

19. Accordingly, on April 2, 2022, Plaintiff notified yardmaster Steve Brennan that Bogan was not following the defendant's safety rules and procedures related to train movements, specifically, Bogan was taking short cuts designed to speed up train operations at the risk of injury and damage to other employees and railroad property.

20.    For example, Bogan did not ensure sufficient space for railcar movements, did not use the proper three-step protection method before going between and behind railcars, did not ensure handbrakes were engaged, did not center the reversers, and left generator field switches open.

21.    Mr. Smith's reporting to Brennan of Bogan's safety violations was a protected activity under the FRSA.

22.    Smith's expectation was that yardmaster Brennan would talk with Bogan regarding Bogan's unsafe work activities.

23.    On or about April 6, 2022, Smith was moved to job assignment HM01 by the defendant's Workforce System for Engineers.

24.    On or about April 7, 2022, due to his working relationship with Smith, Bogan used his seniority as a conductor to follow Smith to job assignment HM01, and notified Bogan that he did so via text message on April 8, 2022.

25.    Smith continued to urge Bogan to improve his job performance, because Smith considered Bogan to be a valued co-worker, and could not sacrifice his safety, Bogan's, or that of other rail workers or the public.

26.    Subsequently, on or about April 28, 2022, plaintiff was employed by the defendant and was again working at defendant's Abrams Yard, King of Prussia, Pennsylvania yard in the capacity of an engineer on job assignment HM01.

27.    On April 28, 2022, the crew consisted of plaintiff, conductor Daniel Bogan and conductor trainee Michael Ford.

28.    The crew was tasked with yard shifting or moving hundreds of different types of railcars from different "consists" (groups of railroad cars) from different tracks into new consists ready to leave the yard.

29. Unfortunately, Bogan continued taking hazardous short cuts, by making the same unsafe moves he had used on April 2, 2022, rather than following the defendant's safety and operating rules.

30. Conductor, Bogan was responsible for "protecting the shove," when moving the different consists. A shove movement means the engineer is in the rear of the train consist pushing the cars forward. During a shove the conductor is in the front car and becomes the eyes for the engineer.

31. To "protect a shove," Bogan should have: (1) inspected and measured the clearances and space on each track that the crew was operating on while moving different railcars into different consists on different tracks; (2) positioned himself at the front of the consist so that the engineer would not be blind; and (3) informed the Engineer, i.e. Smith, of the number of feet to move, half of the necessary distance at a time (i.e. moving the consist a total of 100' would be done by an initial 50' move, then a 25' move, etc. until it was completed) in order to prevent collisions and derailments.

32. However, Bogan did not protect the shove movements that he ordered.

33. Bogan ordered Smith to do a "shove" movement, with 60-70 railcars to couple up with ten empty eighty-five-foot flatcars.

34. Mr. Smith was on the rear of the train in the locomotive. A conductor trainee Ford (who was improperly acting as a switchman which was ordered by Bogan), and Bogan was supposed to be in the front of the railcars, to confirm that the tracks and switches were lined up and there was sufficient room for the shove maneuver.

35. Smith asked, and Bogan confirmed, the tracks and switches were lined up. Smith then asked for a double check because Smith suspected that Bogan was not in the proper position to

confirm the line up. However, when Bogan again confirmed, Smith had to comply, and focused on completing the movement in as safe a manner as possible.

36.    Fortunately, the train did not derail, but during the course of the various movements, due to the curvature of the track, Smith was able to see that not only was Bogan not at the head of the consist, but Bogan was also using Ford as a utility conductor to operate the switches, which Bogan, as a fully trained conductor, should have been doing himself.

37.    Mr. Smith was irritated at this unsafe move. He got out of the locomotive cab onto the platform and saw that Bogan was on the other end of the locomotive on the ground about 50' away, Smith raised his voice to ask Bogan why he had ordered the shove move and requested that Bogan conduct a new safety briefing.

38.    Rather than answer Smith's question, or Smith's follow up questions, which were 1) Why Ford was not kept within the 50' training distance of Bogan; 2) Why Bogan had Ford improperly acting as a utility conductor working the switches; and 3) Why Bogan had not been in position so that the move was not blind, and to ensure that each clearance point and switch was set properly for the various movements, to which Bogan responded by yelling "F*** this, I'm going home."

39.    Bogan then walked into the yard conference room, informed yardmaster Troy Baber that he wasn't going to continue working and left the workplace refusing to perform his conductor duties. Smith did not see Bogan again that day.

40.    Defendant's Trainmaster, Nick Gilmer then proceeded to ask Smith what had happened, and Mr. Smith related the above events including Bogan's safety violations.

41.    Trainee Ford provided a statement that he had ear protection on, and therefore did not hear the words spoken by either Bogan or Smith, but that Smith visually appeared angry.

42.    Mr. Smith's actions in complaining to Bogan and Gilmer about Bogan's safety violations were protected activity under the FRSA.

## FACTS – DEFENDANT'S INITIAL RETALIATION

43.    Rather than disciplining Mr. Bogan or acting upon the FRSA safety complaints made by Mr. Smith to defendants' yardmaster and trainmaster to his surprise, the defendant took Mr. Smith "out of service" pending investigation, not for Bogan's unsafe activities, but Mr. Smith's alleged misconduct.  Mr. Smith has remained "out of service," and unable to work since April 28, 2022.

44.    On May 6th, the defendant sent a charging letter to Mr. Smith, charging him with conduct unbecoming an employee, and that a hearing/investigation would be held on May 16, 2022, at which time the defendant would present Dan Bogan as a witness.

45.    The first Charging Letter and succeeding Charging Letters were sent by Defendant's charging officer, Mr. Gilmer all of which were based on defendant's retaliatory conduct towards Smith due to his safety complaints regarding conductor Bogan.

46.    On May 16, 2022, Smith appeared for the hearing, only to learn that Bogan was not present and would not attend the hearing.

47.    Smith and his union representative both objected to the hearing being continued without the complaining witness Mr. Bogan and requested that the charges be dismissed. Mr. Smith also requested he be reinstated with unpaid wages due to his suspension.  The defendant rejected their request and recessed the hearing after taking some testimony.

48.    On May 20, 2022, Smith was sent another charging letter, scheduling the second hearing for May 26, 2022.

49.    On May 26, 2022, Smith appeared at the second hearing, only to learn again that Bogan failed to appear as a witness and would not attend the hearing.

7

50. Smith and his union representative renewed their objections since the witness was not present, and defendant was not prepared to present evidence on the charge. They renewed their request that the charge be dismissed, and Mr. Smith be reinstated with back wages.

51. The defendant rejected their renewed request and recessed the hearing after taking some testimony.

52. The defendant stated on the record that they would "give one more shot for Mr. Bogan to attend," and that the hearing would be rescheduled for the following week.

53. On May 26, 2022, Smith was sent a third charging letter, scheduling the third hearing for May 31, 2022.

54. On May 31, 2022, Smith appeared at the third hearing, only to learn that Bogan again was not present and would not attend the hearing.

55. Smith and his union representative renewed their objections, as the witness was not present, and defendant was not prepared to present evidence on the charge and renewed their request that the charge be dismissed, and Mr. Smith be reinstated with back wages.

56. Defendant, however, demonstrated its retaliatory intent, by refusing to honor its previous May 26 decision at the second hearing to give "Bogan," and the Yardmaster Gilmer," one more chance," and again recessed the hearing.

57. On June 10, 2022, Smith was sent a fourth charging letter, scheduling the fourth hearing for June 15, 2022.

58. On June 15, 2022, Smith and his union representative appeared at the fourth hearing, only to learn that Bogan again was not present and would not attend the hearing.

59.    Smith and his union representative renewed their objections, as the witness was not present, and defendant was not prepared to present evidence on the charge and renewed their request that the charge be dismissed, and Mr. Smith be reinstated with back wages.

60.    Defendant, however, demonstrated its retaliatory intent, refused to honor its previous May 26 decision at the second hearing to give "Bogan," and the Yardmaster Gilmer," one more chance," and again recessed the hearing.

61.    On June 17, 2022, Smith was sent a fifth charging letter, scheduling the fifth hearing for June 23, 2022.

62.    On June 17, 2022, Bogan was also sent a letter stating that he could participate and provide his testimony remotely.

63.    On June 23, 2022, Smith appeared at the fifth hearing, only to learn that Bogan again was not present and would not attend the hearing, either in person or remotely.

64.    Smith and his union representative renewed their objections, as the witness was not present, and defendant was not prepared to present evidence on the charge and renewed their request that the charge be dismissed, and Mr. Smith be reinstated with back wages.

65.    Instead, defendant, under protest, proceeded to introduce the hearsay statement of Mr. Bogan, who refused to appear, even remotely, to present his testimony.

66.    Mr. Smith and his union representative presented uncontested eye-witness testimony that the Bogan hearsay statement was false, and that Mr. Smith's actions were reasonable given Bogan's unsafe actions and the working relationship between Smith and Bogan.

67.    However, after presenting only hearsay "evidence," defendant then requested that Mr. Smith be charged for conduct unbecoming an employee.

68.     In retaliation for Mr. Smith's FRSA protected activities in reporting Mr. Bogan's unsafe conduct, on July 7, 2022, defendant determined, that "Smith used profane, in appropriate and/or threatening language towards a coworker," based on the "evidence adduced in this investigation," which "clearly proved [Smith's] responsibility," despite the need to hold five hearings and relying solely upon hearsay testimony in gross violation of Mr. Smith's due process rights, rights as an employee, and rights as a FRSA whistleblower.

69.     In retaliation for Mr. Smith's FRSA protected activities in reporting Mr. Bogan's unsafe conduct, defendant assessed Smith a "START Major with time served," violation, and required him, within ninety days, to "submit to counseling at your own expenses with a certified professional specializing in anger management," and provide "as proof a certificate to the Carrier's Medical Department for review," or he would be subject to "further disciplinary action."

70.     To date, in retaliation for his protected activities under the FRSA, Mr. Smith is still "out of service," and has been unable to work since April 28, 2022.

**FACTS - ADDITIONAL RETALIATORY ACTION BY DEFENDANT**

71.     Defendant knew that its actions regarding Mr. Smith were retaliatory in nature and sought to protect their retaliatory actions against Mr. Smith by filing another charging letter against Mr. Smith on June 16, 2022, regarding allegations that allegedly occurred on January 29, 2022, involving Mr. Smith and a Mr. Shawn Mettler.

72.     Defendant knew that Mr. Bogan would not appear, and that punishing Smith for an uncorroborated code of conduct violation against Mr. Bogan, given the far more serious FRSA violations that Mr. Smith had alleged against Bogan, would open defendant up to additional liability under the FRSA.

73. During the Bogan "hearings," defendant revealed that Bogan was still an employee, but no action was being taken to discipline him for his safety violations, let alone his failure to appear, pursuant to the various Charge Letters.

74. Therefore, defendant utilized its "Labor Relations" department to bolster its claims against Mr. Smith and protect itself against further liability.

75. On information and belief, Laura Hogue, a Labor Relations Assistant Director, provided information to the Norfolk Southern in-house police force, specifically to Jason Post, supervisory special agent, to investigate Shawn Mettler, regarding "reports of harassment," by Mr. Smith against Mr. Mettler on January 29, 2022, in defendant's Abrams Yard.

76. The Norfolk police took a statement from Mr. Mettler, determined there was no criminal conduct, and then released this information to yardmasters Smyth and Gilmer.

77. Smyth, as charging officer, then had a conduct unbecoming an employee charge letter sent to Mr. Smith on June 16, 2022, and scheduling a hearing on June 23, 2022.

78. During the June 23, 2022, hearing, Mr. Mettler's testimony was shown to be inaccurate and false, that he had no contact with Mr. Smith on January 29, that Mettler had allegedly complained to yardmaster Nick Gilmer, the charging officer in the Bogan Investigation, yet Mr. Gilmer did not appear to support that testimony, and it was instead revealed that the entire charge was based on information from defendant's "Labor Relations," office.

79. Defendant then determined not to punish Mr. Smith on July 7, 2022.

80. All of defendant's actions above, in both "investigations" of Mr. Smith, and their failure to investigate and take action to improve railway safety operations, and their failure to investigate and discipline Mr. Bogan for his unsafe conduct, demonstrate defendant's retaliatory conduct against Mr. Smith for his FRSA protected activities.

81.    The defendant, through its agents, servants, workmen and/or employees, continued to prevent Mr. Smith from working, for which he is both qualified and had sufficient seniority, and continues to engage in other capricious, arbitrary, and abusive behavior for the sole purpose of retaliating against the plaintiff for his protected activities.

82.    The aforementioned retaliatory conduct was caused by defendant and its various supervisory employees, agents, workmen and/or employees, who intentionally violated the FRSA.

## EXHAUSTION ADMINISTRATIVE REMEDIES

83.    On October 18, 2022, the plaintiff filed a FRSA Complaint with the Secretary of Labor's Region II OSHA Whistleblower Office. This was filed within 180 days from the date the plaintiff became aware of the defendant's intent to take adverse or unfavorable personnel action against him.

84.    The Secretary of Labor has not issued a final decision in this matter.

85.    All of the conduct set forth above demonstrates that the defendant railroad acted with reckless disregard for the law and with complete indifference of plaintiff's rights under the FRSA.

86.    Plaintiff has exhausted all administrative remedies that are required by statute and/or common law.

87.    Pursuant to 49 U.S.C. §20109(d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in the United States District Court for the Eastern District of Pennsylvania, which court has jurisdiction over this FRSA action without regard to the amount in controversy or the citizenship of the parties.

WHEREFORE, in order to encourage employees to freely report all injuries without fear of any retaliation, and further to encourage all employees to freely report unsafe conditions and

12

violations of federal statutes and regulations, thereby ensuring the Federal Railroad Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area in our nation's railroad operations, the plaintiff demands a judgment under the FRSA against the defendant, for all relief necessary to make him whole, including but not limited to:

a. Payment of lost wages and fringe benefits necessary to make the plaintiff whole;
b. Compensatory damages for mental anguish and emotional distress due to the defendant's conduct;
c. Compensatory damages for economic losses due to the defendant's conduct;
d. The statutory maximum of punitive damages; and
e. Special damages for all litigation costs including expert witness' fees and attorneys' fees.
f. Such other relief as the Court deems appropriate under the Federal Rail Safety Act.

COFFEY KAYE MYERS & OLLEY

By:_____
    COFFEY KAYE MYERS & OLLEY
    Robert E. Myers, Esquire
    W. Lyle Stamps, Esquire
    *Attorneys for Plaintiff*
    Suite 718, Two Bala Plaza
    Bala Cynwyd, PA  19004
    (610) 668-9800 – phone
    (610) 667-3352 – fax